NICHOLAS P. IGLEHART

*v.*

DAVID GIBSON *et al.*

1.  FORFEITURE OF CONTRACT—*waiver of right thereto.*  Where a series of promissory notes was given for the purchase price of land, and the con-tract of sale reserved to the vendor the right to declare a forfeiture thereof in case of default in the payment of any one of the notes within a specified time after its maturity, a transfer by the vendor of the last note in the series to a *bona fide* holder, after default in respect to one of the prior notes, and knowledge thereof, would operate as a waiver of the right to declare a forfeiture for such default.

2.  By the transfer of the note last in the series, the vendor was debarred the right of rescinding the contract of sale on account of default in the payment of any of those still remaining in his hands, either under the power given in it or otherwise, because, by such transfer, he had put it out of his power to terminate the contract as to the whole extent to which it remained executory on the part of the vendee.

3.  SAME—*right of vendee to treat the contract as rescinded.*  An attempt by a vendor to declare a forfeiture of the contract of sale, under a power therein given, in case of default on the part of the vendee, when the ven-dor has, by his acts, waived his right so to do, would be wrongful, and put him in fault, so that the vendee would be at liberty to treat the contract as rescinded, stop short in its performance, and when he paid the note which had been assigned, he could sue the vendor in an action at law, and recover back all that he had paid under the contract, although, by the terms of the contract, if the forfeiture had been rightfully declared, all that had been paid by the vendee would have become forfeited to the vendor.

6 — 56TH ILL.

4. NOTICE — *who chargeable therewith.* Where a note, payable at the office of a particular banker, was placed in his hands, before maturity, for collection, by an agent of the payee, that would constitute the banker the agent of the owner, in respect to the note, and the latter would be chargeable with knowledge of a default in its payment at its maturity.

5. SPECIFIC PERFORMANCE — *in favor of vendee — waiver of default by vendor.* While the transfer, by a vendor of land, of the last of the series of notes given for the purchase money, would debar him of the right of rescinding the contract by reason of default in payment of any of the other notes, because he would thereby be disabled from surrendering up all the unpaid notes, such transfer would not operate as a waiver of any default on the part of the vendee in regard to any of the notes maturing after such transfer, so far as such default might affect the right of the vendee to a specific performance.

6. SAME — *effect of payment to the assignee.* The transfer itself, in such case, would be no waiver of subsequent defaults, nor would payment to the assignee after such defaults operate as a waiver of them, because he was a stranger to the contract.

7. SAME — *effect of payment of the last of the series.* Nor would the payment of the note transferred, although it was the last of the series given for the purchase money, so far excuse the default of the vendee in respect to other notes of the series, maturing after the transfer and before such payment, as to entitle him to a specific performance.

8. SAME — *acquiescence of vendee in declaration of forfeiture.* As a part of the purchase price of the land, the vendee was to pay certain notes given by a former owner to a third person, and secured by mortgage on the premises, and made default in respect thereto after the vendor had improperly declared a forfeiture of the contract for prior defaults, and a sale was made under a power in the mortgage : *Held,* from such default on the part of the vendee, after the declaration of forfeiture by the vendor, the former would be presumed to have acquiesced in such repudiation of the contract by the latter.

9. The vendee being able to pay, and refusing payment of his own notes maturing after the vendor had declared a forfeiture, in the absence of explanation, would justify the inference that he considered the contract at an end, especially when he had brought suit to recover back the money he had paid.

10. SAME — *the general rule.* In general, the rule may be stated, that to entitle a party to specific performance, he must show that he has been in no default in not having performed the agreement, and that he has taken all necessary steps toward the performance on his part. If he has been guilty of gross laches, or if he applies for relief after a long lapse of time, unexplained by equitable circumstances, his bill will be dismissed.

11. SAME— *of laches, and excuse therefor.* After a lapse of twelve years a vendee of land filed a bill for specific performance, and the only basis of an explanation of the delay was, that after various defaults on the part of the vendee, and among them, suffering a sale of the premises under a prior mortgage which he had agreed to pay as part of the purchase price, he wrote to the vendor, insisting it was his duty to reclaim the title, the property having been purchased in the name of a third person, and the vendor replied that he had no claim or interest in it, and this representation, which the vendee alleged was not true, he said, had misled him, causing him to bring his action to recover the money back which he had paid, and delayed him in resorting to his remedy for specific performance. But it was held to be no sufficient explanation for the delay, as the vendor was under no obligation, under the circumstances, to disclose his interest, if he had any ; moreover, the vendee had notice long prior to the filing of his bill of the circumstances of the sale under the mortgage.

APPEAL from the Superior Court of Chicago ; the Hon. JOHN A. JAMESON, Judge, presiding.

On the 24th of March, 1856, appellee Gibson, being the owner in fee, of the west ½ of the west ½ of south-east quarter of section 24, township 39 north, range east, situate in Cook county, subject to a mortgage made by one Asa Vail and wife, to Denny and Delano, to secure two notes made by Vail, amounting to $2,120, due September 16, 1856, entered into a contract, of that date, with C. W. Clayton and appellant, though Clayton's name alone was used as vendee, for the sale and conveyance of said premises by Gibson to Clayton, upon the latter paying the former the full sum of $11,386.66, as follows : $1,266.66 in cash; eight notes of appellant, of even date, payable at the office of E. I. Tinkham & Co., Chicago, in one, two, three, four, five, six, seven and eight months from date, for the sum of $1,000 each, and the two notes of Vail, above mentioned, then in the hands of Ogden, Jones & Co., as purchase money for said land to be paid as above set forth.

The prompt performance of which payments and covenants, on the part of the vendee, was expressly made a condition pre-

cedent to Gibson's covenant to give a deed, and time being of the essence of the contract.

The contract also provided, that in case default should be made in any of the payments of principal or interest at the time, or any of the times above specified for the payment thereof and for three days thereafter, the agreement and all the provisions thereof should be null and void at the election of the party of the first part, and all the payments which should then have been made thereon or in pursuance thereof should be absolutely and forever forfeited to the party of the first part.

The cash payment was made and Iglehart's notes delivered to Gibson at the execution of the contract, of which notes four only were paid, viz.: that due in one month from date, and those due in two, in five and in eight months from date. The Vail notes due September 16, 1856, were in no part paid, nor Iglehart's notes, due in three, four, six and seven months from date.

. The mortgage from Vail to Denny & Delano contained a power of sale, and default having been made in the payment of the notes for $2,120 due September 16, 1856, which Clayton was to pay, the mortgagees, on the 11th of October, 1856, advertised the premises for sale on the 10th November, 1856, under the power, at which day they were sold, and one Allen Robbins became the purchaser, for $2,210, which was paid and he received a deed.

It appears in evidence that on the 28th of June, 1856, Gibson assigned, for value, to E. De Witt Robinson, the Iglehart note due in eight months from 24th March, 1856, to whom it was paid on the 27th November, 1856; that on the twenty-seventh of August, the notes due in three and four months, having been presented at the place where payable, and not paid, were again presented to Clayton, but not paid, though the note due the twenty-fourth of August was; that thereupon Gibson, on the twenty-seventh August, repudiated the contract and gave vendee notice in writing of a forfeiture. The Vail notes due September 16th, were not paid; but the Iglehart note due twenty-fourth of that month,

not having been paid at Tinkhams, was presented to Clayton, which he declined to pay, whereupon, on the 27th September, 1856, Gibson made another formal declaration of forfeiture.

On the 8th of July, 1857, Iglehart prepared a letter in Clayton's name and sent it by mail to Gibson, in which, after referring to the contract in question, and speaking of the fact of a sale under the Vail mortgage, the writer claimed that it was Gibson's duty to get the premises released from that sale; that his articles of agreement would require him to do so, or pay damages; also, that Clayton had made full payment of the entire purchase money by cash and notes; that nothing was left for him to pay, as his name was not connected with the notes and it was incumbent on Gibson to collect the notes unpaid. Yet he proposed to advance the money, at once, to take up the paper then unpaid and take a deed. That Gibson could not avail himself of the forfeiture clause in the contract for three good reasons, at least: First, there was nothing in the contract that bound him for any thing except the first cash payment, which was made at the time of its execution. Secondly, he was not bound to pay the notes; then, in order to a forfeiture, for non-payment, a demand should have been made on the day a payment was due, and notice to him of Gibson's intention to forfeit, fully given. Thirdly, if there had been a nominal forfeiture, the payment of the last note was a waiver; that such was the law of Illinois. That he could have demanded a deed as soon as the contract was executed; but, to avoid unpleasant actions, he proposed to pay the amount due, with interest, by buying the notes, and close it up amicably. If Gibson did not choose to do so he should resort to legal proceedings, to save which he made that friendly communication, not waiving any of his rights.

Gibson received this letter at Cincinnati, Ohio, where he lived, and on the twenty-fourth of the same month replied, as follows:

" In regard to the forty acres you speak of, I have no claim or interest in it. If you have allowed the land to be sold

under a mortgage which you promised to pay, it is no fault of mine, and you certainly would not expect me to re-purchase it to repay you for your own neglect of duty."

On the 19th of November, 1859, Clayton assigned the said contract, and all his right, title and interest therein, to Iglehart, who, on the 26th July, 1861, instituted an action of assumpsit in the Superior Court of Chicago, in Clayton's name, to recover back the money paid under the contract.

It appears that March 7, 1859, Robbins, by an arrangement made between him and Zenas Cobb, who had acted as agent for Gibson, in respect to making the contract with Clayton and presentation of the notes, conveyed the premises in question to one Wm. C. Vanderbilt, who was formerly a partner of Gibson, Cobb paying the consideration, by turning over to Robbins a mortgage in his favor against one Parker, for $2,500, and an interest in land estimated at $2,000, but which deed was left unrecorded until January 23, 1869. That on the 26th January, 1869, one William T. Miller purchased the premises for $26,000, and on the 9th March, same year, received a deed from Vanderbilt and wife and Gibson and wife.

On the 30th January, 1869, Iglehart, having taken no steps in his suit at law since its commencement, dismissed it, and filed the bill herein for specific performance of said contract. The bill alleges no excuse for the non-payment of the four Iglehart notes, or of the Vail notes, the payment of which was part of the purchase money agreed to be paid.

It seeks to avoid the effect of the suit at law, by alleging that Gibson, although he had an interest in the premises, after Robbins purchased, represented by the letter of 24th July, 1857, that he had none, and that appellant was ignorant of the facts until January, 1869; alleges the want of sufficient notice in the mortgage sale, of which he was likewise ignorant, and claims that the sale was void.

Gibson, among other things, in his answer, sets up as ground of resistance to specific performance, Clayton and Iglehart's

default in making payment of the four Iglehart notes, and default as to the Vail notes, *laches* and bad faith.

Miller relies in his answer upon the same grounds, and the defense of *bona fide* purchaser for valuable consideration without notice.

Replication was filed. On the hearing upon the pleadings and proofs, the court below dismissed the bill.

Messrs. DENT & BLACK, for the appellant.

Messrs. BECKWITH, AYER & KALES, for the appellees.

Mr. JUSTICE McALLISTER delivered the opinion of the Court:

At the time of the making and maturity of the Iglehart notes in question, no days of grace were allowable by the laws of this State, upon promissory notes. *Rees* v. *Mitchell*, 41 Ill. 365. Consequently, the note dated the 24th March, 1856, and payable three months after date, became due on the 24th of June. By the provisions of the contract in reference to forfeiture, that right accrued upon a default continuing three days after any note became due. On the 28th of June, Cobb, who acted as the general agent of appellee Gibson in the premises, and all of whose acts and doings were approved by him, transferred by indorsement, in the name of his principal, the note due in eight months from the 24th of March, 1856, to Robinson, for a valuable consideration, the latter becoming, so far as this record shows, a *bona fide* holder thereof. This act of dealing with the purchase, if done with knowledge of the fact of default in the payment of the three months' note, would amount to a waiver of any right of forfeiture of the contract, for such default.

Gibson was chargeable with such knowledge. The notes were made specifically payable at the office of E. I. Tinkham & Co., Chicago; and besides, Cobb had put them, before

maturity, into the hands of that firm for collection. They, therefore, were the agents of Gibson, and must have known of the default. Cobb was also living and doing business in Chicago, and evidently keeping close watch in the premises.

Default was also made, under the same circumstances, as to the four months' note, due July 24, 1856; but the five months' note, due at the same time in August, was paid by Iglehart on the 27th of that month, and payment received by Gibson's agents.

But, notwithstanding all these circumstances, Gibson, by his agent, on the 27th August, 1856, repudiated the contract, and declared it forfeited.

By the transfer of the eight months' note to a *bona fide* holder, as above stated, Gibson was debarred the right of rescinding the contract either under the power given in it, or otherwise, because he had put it out of his power to terminate it as to the whole extent to which it remained executory on the part of the vendee. *Murphy* v. *Lockwood*, 21 Ill. 615; *Chrisman* v. *Miller*, id. 236.

The six months' note, due on the 24th September, 1856, was, notwithstanding the previous acts, presented at the office of Tinkham & Co., for payment, at the time of its maturity, and payment demanded, but which was refused. Then on the 27th of the same month it was presented to Clayton, and payment demanded, which was expressly refused, and on that day the contract was again repudiated on behalf of Gibson, and declaration of forfeiture again made. In each case the declaration of forfeiture was made in writing, in a formal manner, and served personally upon Clayton. Under these circumstances, Gibson had no right to repudiate the contract, the act was wrongful and put him in fault, so that the vendee was at liberty to treat it as rescinded, stop short in its performance, and when he paid the note assigned to Robinson, the payment of which he could not successfully resist, could sue the vendor, in an action at law, and recover back all that he had paid under it.

And this, it seems, was the remedy resorted to, for, after the

assignment by Clayton, in 1859, of his interest in the contract to appellant, the latter, on the 26th July, 1861, commenced an action of assumpsit in the name of the former, in the Superior Court of Chicago, against Gibson, to recover back the money paid, but no steps were ever taken in the cause, although personal service was had upon Gibson, but it was permitted to remain thus pending, until the 30th of January, 1869, when, after a period of over seven years and a half, it was voluntarily dismissed by the plaintiff in interest, and this bill filed for specific performance, which is resisted upon two principal grounds : First, that appellant does not, by his bill, attempt to excuse the non-performance of the contract by the vendee, in essential particulars. Secondly, long lapse of time or gross *laches* unexplained.

It is conceded that default was made in the payment of the Iglehart notes, due, respectively, in three, four, six and seven months from date, and in the payment of the Vail notes, due the 16th September, 1856 ; the payment of all which, at the times they respectively came due, was a condition precedent to the execution of a conveyance by the vendor, and that time was of the essence of the contract.

It is not required of this court to say what would constitute a sufficient excuse for these defaults, because none is attempted to be set up, except the mere fact of the payment of the last note, due in eight months from date. The payment of that note was to a *bona fide* holder, not connected with the contract. The transfer of it on the 28th of June, as we have seen, would debar the vendor of the right of rescinding the contract, but it was neither an excuse for, nor waiver of, the subsequent defaults, as to the notes due in six and seven months, or the Vail notes, due the 16th September. Not an excuse, because the assignment of the note to Robinson in nowise prevented, interfered with, or embarrassed the vendee in the performance of his contract. It was not a breach of the contract on the part of the vendor. The notes were made negotiable, and he had a legal right to negotiate them, and the only consequence

was, that it debarred him of exercising another right, the proper exercise of which was dependent upon his ability and willingness to surrender up all unpaid notes to the vendee. It was no waiver of the defaults intervening the transfer and payment to Robinson. The transfer itself could be no waiver, because there was then no default, and of course, no knowledge that the defaults would happen. The receipt of the money upon it by Robinson could have no such effect, because he was a stranger to the contract.

Waiver is the relinquishment or refusal to accept of a right. Robinson, as the holder of the note, was vested with no right under the contract, and could therefore relinquish none. The transfer of the note by Gibson was, as to him, a payment of it at that time. Suppose Gibson had, at the date of the transfer, proposed to Iglehart to receive the *then* present worth of the note, and the latter had paid it; would it be contended that such payment was a waiver of all defaults occurring between that time and that of the maturity of the note?

We have seen by the proofs that a formal declaration of forfeiture was made on the 27th of August, which was wrongful and would authorize the vendee to treat the contract as rescinded and recover back the amount paid under it. Did the vendee not make this election? If he intended to hold the contract as subsisting, and claim specific performance of it, he should have paid, or tendered, the amount due on the Vail notes, September 16, 1856, and upon the Iglehart note due on the 24th same month. By making default in these payments, and letting the property be sold on the Vail mortgage, without showing it to be the result of fraud, accident or mistake, he must be presumed to have acquiesced in the repudiation of the contract by the vendor. Iglehart testifies to an ample ability on his part to pay. He says the non-payment of the Vail notes was an oversight. But Ogden, a disinterested witness, says, that Iglehart knew the notes in his hands were coming due, and that a sale would be made if they were not paid; that he promised to give his attention to it but he did not. Then the

vendee's attention was directly called to the Iglehart note, due on the 24th September, 1856, by a demand made upon him on the 27th, and with ample ability to pay he positively refused to do so. What other inference can be drawn, in the absence of any explanation, than that they had elected to treat the contract as at an end, especially when we find that suit was afterward commenced to recover back the purchase money paid? *Herrington* v. *Hubbard*, 1 Scam. 569. From the frame of the bill, appellant seems to have supposed that the vendee could refuse to pay at his discretion, if he only paid the last note, and a payment of that, though to a party other than the vendor, would give him the right to have specific performance of his contract; because, the only allegations of the bill as to performance by the vendee or appellant are, that the cash payment of $1,266.66 was made at the time of executing the agreement, and that afterward, the first, second, fifth and eighth of the notes of Iglehart, mentioned in the agreement, were paid. " The last of which said notes, dated March 24, 1856, and payable eight months from date, was duly paid at maturity, to wit, on the 27th day of November, 1856." It is not alleged that it was paid to Gibson, nor is any thing concerning the transfer of it to Robinson, or the repudiation of the contract on the 27th of August by the vendor, and no excuse is pretended to be set up for the non-payment of the Vail notes, or any of the other four Iglehart notes. Enough of the contract is set out to show that time was of the essence of it.

" No rule," said this court, " is better settled than that a party can not compel specific performance of a contract in a court of equity, unless he shows that he himself has specifically performed, or can justly account for the reason of his non-performance." · *Scott* v. *Shephard*, 3 Gilm. 483; *Heckard* v. *Sayre*, 34 Ill. 142; *Stow* v. *Russell et al.*, 36 id. 18; *Supervisors* v. *Henneberry*, 41 id. 180.

" In general, it may be stated, that to entitle a party to specific performance he must show that he has been in no default in not having performed the agreement, and that he has taken all

92          Iglehart *v.* Gibson *et al.*          [Sept. T.,

Opinion of the Court.

necessary steps toward the performance on his part.  If he has been guilty of gross *laches*, or if he applies for relief after a long lapse of time, unexplained by equitable circumstances, his bill will be dismissed."  2 Story's Eq. Jur., § 771.

Here the bill shows upon its face that the party seeking specific performance has been in default, and which he does not attempt to account for.

He applies for relief after a long lapse of time — upwards of twelve years.  Is this delay explained by equitable circumstances?  If not, appellant has been guilty of gross *laches*.

The entire basis of the explanation is, that Gibson, by stating in his letter of the 24th July, 1857, in reply to the Iglehart-Clayton letter of the 8th of that month, that he then had no claim or interest in the property, misled appellant and Clayton.  But, the first question is, was Gibson under any duty whatever to make disclosure as to his interest?  It was not his fault that the property had been sold under the mortgage, but the fault of appellant and Clayton.  There is no pretense that there was any fraud or abuse of the power in making the sale.  Gibson, therefore, had a perfect right to obtain an equitable or any other interest in the property, and hold it in any manner he pleased, and if he was under no obligation to make disclosure of his interest before, certainly it can not be pretended by anybody not blinded by the pardonable infirmities of paternity toward offspring, that the letter of July 8 imposed any; for, a more uncandid communication, or one fraught with more unreasonable claims, can seldom be found in the records of human affairs.

But Iglehart testifies, that M. D. Ogden, about the last of November, 1856, called his attention to the advertisement and sale, and that he found that Cobb virtually paid the money and did all the business, but had the property struck off to Robbins, Gibson still having an interest in the property to the extent of witness' four unpaid notes and his agreement; witness did not believe this sale *bona fide* or binding.

If he knew, in November, 1856, that Cobb virtually paid

the money, but the property was placed nominally in Robbins' name, and inferred from facts within his own knowledge, that Gibson had an interest, and that the sale was not *bona fide* or valid, then is it reasonable or probable that the answer Gibson made to the provoking claims and pretensions of appellant's letter of the 8th of July could have had any tendency whatever to mislead appellant or improperly shape his course? He says he was led by it to bring the action at law in 1861. If so, he was induced to resort to his proper remedy, which should, under the circumstances of this case, have been pursued with diligence.

The bill in this case fails to state a case for specific performance, because it fails to excuse defaults on the part of appellant, apparent upon the face of it. The case made by the proof is different from that attempted to be stated in the bill. The delay in applying for relief is unexplained by equitable circumstances. For these reasons we are of opinion that appellant has not shown himself entitled to specific performance, as against Gibson, and, as a matter of course, he is not, as against Miller, the purchaser of the property.

The decree of the court below is therefore affirmed.

*Decree affirmed.*